IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 6, 2012 Session

**TAMAINE WORKS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 04-02321    Chris Craft, Judge**

---

**No. W2011-00209-CCA-R3-PC  - Filed July 20, 2012**

---

The Petitioner, Tamaine Works, appeals from the Shelby County Criminal Court's denial of post-conviction relief from his conviction for first degree premeditated murder and resulting life sentence. On appeal, the Petitioner contends that he did not receive the effective assistance of counsel and that the assistant district attorney general committed prosecutorial misconduct at his trial. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Joseph S. Ozment (on appeal), and Larry Copeland (at post-conviction hearing), Memphis, Tennessee, for the appellant, Tamaine Works.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy Weirich, District Attorney General; and Chris West, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The facts related to the Petitioner's conviction were stated by this court in the appeal of his conviction:

> The conviction in this case stems from the October 9,
> 2003 murder of Mr. Keon McChristian[2] (the "victim") in an

---

[2]The indictment recites the victim's last name as "McChristain."

apartment complex in Memphis. The Defendant, Tamaine Works, confronted the victim in a second floor hallway at the Peppertree Apartments about 10:30 at night and fired four shots from an assault-type weapon, hitting the victim twice. The victim died from his wounds. The Defendant fled the scene but was arrested by police at the same apartment complex several months later. In March of 2004, the Defendant was indicted by a Shelby County grand jury on one count of first degree, premeditated murder. The Defendant received a jury trial, which was conducted over the course of several days in February and March, 2005.

Before the jury was seated, the trial court took up several preliminary matters. The State presented a motion to exclude the Defendant from introducing testimony concerning the victim's alleged involvement in the death of a friend of the Defendant a few hours prior to the murder at issue in this case. The State argued that any evidence of this prior killing was not relevant. The Defendant presented a motion to exclude the prior testimony of a State witness who was unavailable to testify at trial, alleging that the statement, although made under oath at a preliminary hearing, was unreliable. The trial court granted the State's motion and excluded testimony concerning the prior homicide but denied the Defendant's motion and allowed the prior testimony of the unavailable witness.

At trial, the State's lead witness, Ms. Kimberly Pruitt, testified that on the night of the murder, she was staying with her cousin at the Peppertree Apartments. As she exited her cousin's apartment with her six-year-old son sometime after 10:00 in the evening on October 9, 2003, she passed the Defendant in the hallway on the second floor of the apartment complex building. She recognized the Defendant as someone she had seen around the complex for several years and who was a friend of "Brian," the man her cousin was dating at the time. As the Defendant passed her in the hallway, Ms. Pruitt's cousin, who was immediately behind her, asked: "Tam[a]ine, what you

-2-

fixin' to do?"[3]  Ms. Pruitt stated the Defendant replied, "Shhh," indicating the two women should remain quiet.

Ms. Pruitt stated that at the time, the Defendant was not wearing a shirt, had on black or dark-colored jeans, and was carrying a large gun only partially concealed in a garbage bag. She further stated that the Defendant was only three or four feet from her when they passed in the hallway, and she saw his face. The Defendant walked toward the apartment next door, the residence of a man known as "V." Ms. Pruitt walked the opposite direction toward the stairs, and her cousin went back inside her apartment and closed the door. Ms. Pruitt testified that she then saw the Defendant shoot the victim, which she described as follows: the victim came out of "V"'s apartment; the Defendant shot the victim two times; the victim fell to the floor; the Defendant shot the victim two more times; the Defendant then fled.

Ms. Pruitt testified that after the Defendant fled, she ran to the victim, who said: "He shot me." Ms. Pruitt stated that she called 911 from her cellular phone and reported the incident. She also stated that approximately five or ten minutes after the shooting, "V" came and asked her who shot the victim, but she declined to answer. She further stated that when "V" heard the police arrive, he took off. Ms. Pruitt also testified that the victim did not have a gun. When the police arrived, she was forced to place her hands in the air, but when they learned she was not a threat, she was allowed to leave and did not give a statement to the police the night of the murder.

Ms. Pruitt also testified that she began to receive threats over her cellular phone from the Defendant's friend, who would call and tell her that she did not "need to be testifying against his friend and that something's going to happen to [her] and [her] children if [she] do[es] come forward." Because of these

---

[3]The record reveals that Ms. Pruitt's cousin could not be located at the time of the trial.

threats, Ms. Pruitt did not make a statement to the police until several weeks later when she was in the hospital.

On cross-examination, Ms. Pruitt admitted she had a felony record. She stated that she did not tell "V" who shot the victim because she was "paranoid." She also stated that "V" did not take anything from the victim, but that "V" was carrying a hand gun. Ms. Pruitt also clarified that while she did not make a statement to the police the night of the murder, she did leave an anonymous tip on the 528-CASH tip-line the following day. However, she then began to receive threats over the phone and therefore did not talk to the police until several weeks later when she was in the hospital suffering from anxiety attacks and no longer wanted to "hold it in." The police came to her hospital room and she gave them a statement. She also admitted that during this meeting she was shown a photographic line-up but could not identify the Defendant's photo because she was on medication that caused blurred vision[4]. However, she did identify the Defendant's photo at trial. She also identified the Defendant in court as the man she witnessed shoot the victim.

Ms. Memorie Noel, the victim's aunt, also testified at trial, stating that she lived in the same apartment complex and heard four gunshots on the evening of the incident at approximately 10:30. Shortly thereafter, a neighbor came to her door and informed her that her relative had been shot. She rushed to the victim, who was lying on the ground, and noted that also at the scene was "a girl" and "V," whom she identified as Vincent Sulton, who also went by the moniker "Big V" and "V Dog."

Sergeant Gene Hulley, an Investigator with the Memphis Police Department Felony Response Squad, testified that he

---

[4]Sergeant Barry Hanks of the Memphis Police Department also testified at trial that he showed Ms. Pruitt the photographic line-up while she was in the hospital, but she stated she could not see well due to medication.

assisted the crime scene investigators on this case. Although the victim had been removed by the time he arrived, he stated that he observed at the crime scene bullet holes on the building walls, spent shell casings, and a blood stain on the floor. He described the shell casings as consistent with a "large caliber, automatic weapon."

Officer Ellason Flagg of the Memphis Police Department testified that on January 24, 2004, she received a report that the Defendant was at the Peppertree Apartments. There was a warrant for the Defendant's arrest. Officer Flagg stated that when the Defendant saw the uniformed officers, he fled. The officers pursued, eventually captured the Defendant, and placed him under arrest.

An audio tape of Memphis Police Officer Sergeant Sims' testimony at the Defendant's March 4, 2004 preliminary hearing was played for the jury at trial and entered into evidence[5]. Sgt. Sims testified that he attempted to take a statement from the Defendant after his arrest, but the Defendant, after he was advised of his rights, elected to not make a formal statement. However, the Defendant did remark to Sgt. Sims that "wasn't nobody going to make it to testify against him in the courtroom." Sergeant Sims also stated that the Defendant refused to sign the advice of rights form.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, was certified as an expert in the field of forensic pathology, and testified that the victim suffered from a gunshot wound to the lower abdomen that did "extensive damage," and one gunshot wound to the leg. Dr. Chancellor opined that the gunshot wound to the abdomen was the cause of death because it severed two large blood vessels and caused massive bleeding.

---

[5]The record reveals that Sergeant Sims of the Memphis Police Department was deceased at the time of trial.

Mr. Anton Armour, an acquaintance of the Defendant, was subpoenaed by the State and testified at trial, admittedly against his will, that at some point after the murder he was with the Defendant. They were talking about the past, and the Defendant made the following statement: "Man, you know I'm a real nigger, I'm a killer, you can ask them niggers in the Peppertree about me." On cross-examination, Mr. Armour admitted he was a convicted felon.

The Defendant, properly advised of his rights, elected not to testify on his own behalf. The defense [called] Sergeant Timothy Cooper of the Memphis Police Department, who testified that when he arrived at the crime scene shortly after midnight, there was no one there who witnessed the crime and was willing to talk to him. Officer William Merritt of the Memphis Police Department testified that he interviewed the Defendant along with Sgt. Sims, and stated that the Defendant did sign the advice of rights form[6]. Officer Merritt also stated that the Defendant never made any incriminating or threatening statements while in his presence, but admitted on cross-examination that there were times when the Defendant was alone with Sgt. Sims.

The defense also called Mr. Vincent Sulton, a.k.a. "V." Mr. Sulton testified that in his initial statement to the police, made about four days after the crime, he stated that he had no personal knowledge of the events on the evening of the murder but knew the Defendant shot the victim because the Defendant had communicated threats, warning him not to talk. However, Mr. Sulton later made a second statement to police in which he recounted that he and the victim were away from the apartments the day of the murder when the victim informed Mr. Sulton he was going to go to his apartment at Peppertree. Mr. Sulton informed police that the victim arrived first, he followed, and he was just coming up the stairs when he heard shots and saw the Defendant with a gun. The Defendant pointed the gun at him and then ran off. Mr. Sulton then informed the police that he

---

[6]A copy of the advice of rights form, bearing the signatures of the Defendant, Sgt. Sims and Officer Merritt, was entered into evidence.

was unarmed, went to the victim, took a handgun from the victim, threw it onto the roof, and ran when he heard the police.

On cross-examination, Mr. Sulton gave a third version of the events of the evening, testifying that he in fact did not come up the stairs, but rather was in his apartment when he heard the shots fired, and then came out. He maintained that he did not have a gun until he took one off of the victim, and he then chased after the Defendant. Mr. Sulton further stated that the Defendant called him "not even an hour afterwards" and threatened to kill him. Mr. Sulton also denied having ever told Ms. Turner, Mr. Nelms or Ms. Noel that the gun he had was his and that he retrieved it from off the television set in his apartment.

The State called three rebuttal witnesses: Ms. Roshunda Turner, the victim's aunt; Mr. Damen Nelms, the victim's uncle; and Ms. Memorie Noel, another aunt of the victim and a previous witness. All three testified that they saw Vince Sulton a day after the murder, and he told them that after the shooting he went into his apartment and got a gun which was located on his television set.

State v. Tamaine Works, No. W2005-01048-CCA-R3-CD, Shelby County, slip op. at 2-5 (Tenn. Crim. App. May 26, 2006), perm. app. denied (Tenn. Nov. 6, 2006).

At the post-conviction hearing, trial counsel testified that he represented the Petitioner in the conviction proceedings. He estimated that he was retained or appointed ten to twelve months before the trial. He said the Petitioner was one of his favorite clients. He said he was never informed of a potential alibi defense. He said the Petitioner never denied shooting the victim. He recalled that he realized the Petitioner was the shooter when the Petitioner became very upset with Kimberly Pruitt, who testified at the preliminary hearing as an eyewitness, because the Petitioner said she was not the person who opened a door and saw him outside an apartment with a big gun.

Trial counsel testified that there were two alternative strategies available. First, the defense might pursue a voluntary manslaughter theory based upon the Petitioner's killing the victim after learning that the Petitioner's best friend had been killed hours earlier. He said the prosecutor seemed to agree with this theory because the prosecutor made a second degree murder plea offer. The second theory was that Ms. Pruitt was lying and that she did not

identify the Petitioner when the police showed her photographs while she was hospitalized, even though she had known him for a long time. He said the Petitioner identified another woman as the person who saw him outside the apartment, but the Petitioner could not recall the woman's name. He said that at every meeting before the trial, he and the Petitioner discussed the Petitioner's contention that Ms. Pruitt was lying. He said he talked to Ms. Pruitt at the preliminary hearing and at the trial but did not think he talked to her between them.

Trial counsel testified that he wanted to talk to a man who had been inside the apartment and who had given conflicting statements, but he was not able to do so because the man was represented by counsel. He agreed that he did not do any further investigation of the information disclosed by the State. He said that he did not go to the crime scene to take photographs but that photographs were provided to him. He said he saw no reason to "waste the State's money to send somebody out there to verify what [he] believed to be true." He said that misidentification due to lighting or other conditions was not an issue because Ms. Pruitt claimed to have seen the Petitioner at the door from two to three feet away. Counsel acknowledged that he never looked on the roof at the scene, even though there was evidence that the gun and a liquor bottle were on the roof. He said he did not know about the gun on the roof at the preliminary hearing stage because there was nothing in the affidavit of complaint about it. He said he did not obtain a mental evaluation of a client if he did not appear to need one. He said there were no alternative theories of how the shooting occurred.

Trial counsel testified that it was apparent to him early in his representation that either the Petitioner was present when the Petitioner's best friend was killed or the Petitioner received the information about the killing from someone. He said the Petitioner was adamant that he was not present. Counsel said he wanted to interview any witness who told the Petitioner about the killing and asked the Petitioner if there were any witnesses he should investigate. He said they discussed this "very paramount issue" before the trial. He said the Petitioner did not want him to call any witnesses relative to a heat of passion defense. He said that the prosecutor seemed to understand that the crime occurred in the heat of passion and that they attempted to negotiate a plea agreement, but the Petitioner was not interested. He said he intended to present a heat of passion defense, but the trial judge ruled that the defense could not present this theory unless the Petitioner or another witness provided relevant testimony. He said he argued that the ruling infringed upon the Petitioner's Fifth Amendment right not to give evidence against himself. Counsel said that his conversations with the prosecutors involved the heat of passion defense and that he did not anticipate they would ask the court to exclude evidence of a heat of passion defense unless the Petitioner testified. He said that until the day of the trial, he assumed that the heat of passion defense could be developed through his cross-examination of witnesses and that he would not need other witnesses on this point. It never occurred to him that the State would object to

evidence of a heat of passion defense. He thought the question of relevance occurred to one of the prosecutors on the Friday before the trial began on Monday when he said that the Petitioner might not testify.

Trial counsel testified that after the court ruled that the defense must establish the relevance of a heat of passion defense, he talked to the Petitioner. He advised the Petitioner to consider the plea offer or to tell him where to find the woman who told the Petitioner about the earlier shooting. He said that he wanted to call the woman as a witness but that the Petitioner "absolutely did not want to do that." He thought that at the time, the Petitioner did not want to disclose that he was the shooter. He said, however, that the Petitioner never affirmatively said he was the shooter. Counsel said the only eyewitnesses were the woman in the apartment and Mr. Sulton, who did not see the shooting but removed the victim's gun.

Trial counsel testified that the State decided not to call Vincent Sulton[7] to testify in order to avoid evidence about the prior shooting. He said that although he could not use Mr. Sulton to establish the prior shooting, he called Mr. Sulton as a defense witness to show that Mr. Sulton took a gun from the victim. He agreed that self-defense could have been a defense theory but said it was not considered because it was clear that the Petitioner shot the victim to avenge his best friend's killing.

Trial counsel testified that he presented the testimony of a police officer who canvassed the area near the scene to show that no one had any information about the shooting. He presented this evidence to rebut the testimony of the State's witnesses who said they had been at the scene ready to talk to the police. He said he also called Detective Merritt to rebut a police officer's prior testimony that was unfavorable to the Petitioner. He said that he unsuccessfully opposed admission of the prior testimony as unreliable but that the court admitted it because the officer died before the trial.

On cross-examination, trial counsel testified that before representing the Petitioner, he had represented about thirty defendants in murder cases. He said he had more jury trial experience in first degree murder cases than other cases. He was a former law clerk for a court of criminal appeals judge, and he did criminal trial and appellate work once he entered private practice.

_____

[7]Vincent Sulton's surname is spelled "Sultan" and "Sutton" in the post-conviction hearing transcript. We have used "Sulton," the spelling that appears in this court's opinion in the Petitioner's direct appeal.

Trial counsel testified that self-defense was not a viable option. He said the viable options were a voluntary manslaughter defense and establishing reasonable doubt by showing that the State's main witness lied. He acknowledged that he was somewhat thwarted by the State's late tactical move. He reiterated that the Petitioner did not provide any information about an alibi. He said the Petitioner told him repeatedly about crying as the Petitioner's best friend was taken away in an ambulance, to die later.

Trial counsel testified that he hired investigators in murder cases when there was a need for an investigation or if there were things a client told him that were not covered by the discovery materials. He said there was not a need for an investigator in this case and noted that the Petitioner's account was consistent with the State's facts. He said that a substantial amount of time elapsed before he received Mr. Sulton's statement about the gun and that he did not think an investigator would have found the gun after he learned of the statement. He also said he did not know how he would be able to establish after one and one-half years that the gun was the victim's. He said that for the first six months of his representation, the Petitioner maintained that Ms. Pruitt's account could not be correct, but that the Petitioner did not admit he was at the scene. He said the Petitioner eventually admitted the type of gun he had, the garbage bag over the gun, and what he was trying to do. Counsel acknowledged that his cross-examination of Ms. Pruitt was unsuccessful but asserted that he made his best effort. He said that his trial strategy included emphasis on Ms. Pruitt's previous failure to identify the Petitioner and that a motion to suppress evidence of the identification procedure would have been counterproductive.

Trial counsel testified that the State's first settlement offer was for twenty years. He said he reviewed the offer, the sentence, and the required percentage of service with the Petitioner. He discussed the State's second offer for fifteen years with the Petitioner. He said the State made an offer for thirteen and one-half years during the trial, which the Petitioner refused. He said that he and the Petitioner felt good about the trial when the Petitioner turned down the third offer. He said he was used to clients refusing good offers and denied getting angry at the Petitioner or treating him differently.

Trial counsel testified that the Petitioner was one of his favorite clients because the Petitioner was communicative about what he did and did not want. He said the Petitioner agreed with the direction of the case. He said he had good rapport with the Petitioner's mother, as well.

With respect to the appeal, trial counsel testified that he reviewed his notes and the transcript to determine the appellate issues. He said his appellate strategy was not to raise every possible issue because doing so detracted from the issues which offered the best possibility for relief. He said he maintained communication with the Petitioner throughout

the appellate process, although there were not many occasions for updates. He said the appeal was unsuccessful, which was not unusual in criminal cases.

Trial counsel acknowledged that he may have prompted one of the prosecutors to realize that the State could challenge the defense's ability to cross-examine witnesses about heat of passion evidence. He said he "joked" with one of the prosecutors before the trial by indicating the Petitioner might not testify. He said it was not unusual to be equivocal with a prosecutor about whether a defendant would testify. He said that had he known the State would challenge the admissibility of cross-examination evidence of the prior shooting, he would not have relied on the State to call Mr. Sulton as a witness or expected to be able to cross-examine Mr. Sulton about the prior shooting. He said he met with the Petitioner after the trial court's ruling and advised him that the fifteen-year offer was "not such a bad offer any more." He said the Petitioner was adamant that he would not accept the plea offer and that he wanted counsel to challenge Ms. Pruitt's testimony that she was at the scene. He advised the Petitioner that they could make the prior homicide relevant if the Petitioner had a witness who would testify that he or she saw it and told the Petitioner about it. He said the Petitioner, however, did not want to get "her" involved. He stated that after the court ruled against the defense, he was concerned about the defense and determined that the options were for him to convince the Petitioner to plead guilty, for the Petitioner to testify, or for him to convince the jury that the State failed to sustain its burden of proof.

On redirect examination, trial counsel acknowledged that he pursued the voluntary manslaughter theory even though he knew the Petitioner did not want to testify. He thought the reason and state of mind for the killing would be clear to the jury even if the Petitioner did not testify. He said one of the prosecutors acknowledged to him that the verdict might be voluntary manslaughter. He identified his billing records, which he said were created when he prepared his billing statement about one year after the case concluded. He identified an entry which showed he delivered the fifteen-year offer two months and two days before the trial and said it probably was the same day he received the offer. He said there had been a previous twenty-year offer when he received the discovery information.

Sherrill Royston, the Petitioner's mother, testified that she was present at the Petitioner's trial. She said that after Mr. Sulton was questioned about the location of the victim's gun, she overheard one of the prosecutors tell other State's witnesses that they must testify that the gun was on a television set, not thrown on the roof, in accord with Mr. Sulton's testimony. She said that afterwards, one of the victim's family members testified to that effect. She thought the witnesses involved were family members of the victim, but she could not identify them by name.

-11-

On cross-examination, Ms. Royston testified that the prosecutor said, "[Y]ou're going to have to say exactly word for word what the first witness has said. . . . [Y]ou're going to have to say that." She said that four or five of the people testified. She said she had stepped out of the courtroom to pray when she heard the prosecutor instruct the witnesses about their testimony. She said she was holding her Bible but was not reading it. She acknowledged her prior statement to a defense investigator in which she said she was reading her Bible when she overheard the prosecutor's instructions. She said she mentioned the prosecutor's actions to trial counsel but did not recall when she told him about it.

On redirect examination, Ms. Royston testified that she had not had the opportunity to review the statement she gave the defense investigator or to correct any misinterpretations. She said she had her Bible open and was praying when she overheard the prosecutor's instructions to the witnesses.

Summer Hampton testified that she married the Petitioner after he was in prison. She recalled the date of the crime because it was the same day that Derrick Robertson, the Petitioner's friend, was killed. She said that she learned of Robertson's killing about 7:30 p.m. that day but that she did not tell the Petitioner. She did not know if the Petitioner knew of the incident. She said the Petitioner came home to the Petitioner's aunt's apartment about 8:30 p.m. and did not leave the apartment that night. She claimed the Petitioner was with her when the victim in the Petitioner's case was killed. She said her three children were with them at the apartment. She said that the Petitioner's aunt, Mary Barnes, came home about 9:00 p.m. and that Ms. Barnes was now deceased. She said she and the Petitioner went to bed before 10:00 p.m. and awakened the next morning around 6:30. She said that no one ever asked her about the evening of the victim's homicide.

On cross-examination, Ms. Hampton testified that neither she nor the Petitioner was working at the time of the crime. She was about twenty-five and the Petitioner about twenty-two at the time. She said they awakened at 6:30 a.m. in order to get her son ready for school. She maintained that they went to bed around the same time every night. She said they discussed Mr. Robertson's homicide that night. She was not present when Mr. Robertson was killed and did not know where the Petitioner was before he came home. She said Kimberly Longmeyer told her about Mr. Robertson's death.

The Petitioner testified that trial counsel failed to communicate with his alibi witnesses. He said he tried to talk to counsel about the witnesses and denied that he told counsel not to talk to them. He said the alibi witnesses were Summer Hampton, Mary Cole Shelby, Latoya Banks, and Mary Barnes. He said Mr. Robertson took him to see Ms. Shelby, his parole officer, around 4:00 or 5:00 p.m. He said Ms. Banks was a resident of the apartment complex where Mr. Robertson was killed and could have testified about what

happened there. He claimed counsel told him that the State made a settlement offer of twenty years at eighty-five percent and that they would have to go to trial if he did not accept the offer because the State would not budge. He said counsel never communicated a fifteen- or thirteen-year offer to him. He claimed he asked counsel to see if the State would accept a fifteen-year offer. He said that after the trial, he asked counsel about the fifteen-year offer and that counsel said he thought he told the Petitioner about it and apologized if he did not.

The Petitioner testified that trial counsel advised him not to testify and said the State would question him about his "charges." He claimed he wanted to testify but said he deferred to counsel's wisdom from experience. He denied that trial counsel reviewed the evidence with him. He stated that he asked counsel to hire an investigator but that counsel said he was going to rely on the State's information. He said he wanted an investigator to make photographs from different angles than the State's photographs and to look on the roof for the gun. He also wanted an investigator to search for a woman named Ranita, whom he said may have provided information to Ms. Pruitt. He stated that counsel assumed he was present when the victim was killed but that he was not. He said he tried to tell counsel that counsel could show that Ms. Pruitt was not truthful about being present when the victim was killed.

The Petitioner testified that had he testified at his trial, he would have said he had nothing to do with the crime. He said he would have testified that he was at Graceland Farms with Ms. Hampton, Ms. Barnes, and the children.

On cross-examination, the Petitioner testified that he complained to trial counsel in person about counsel's performance. He acknowledged a letter he sent counsel on January 26, 2006, which was after the Petitioner's March 2005 trial, in which he said that counsel was doing his job. He said he was appreciative of the "little things" counsel did at the time. He also acknowledged a September 2005 letter in which he asked if he could take the fifteen-year offer, even though this was after his trial.

The Petitioner testified that trial counsel gave him the discovery materials. He said he did not receive some of the materials, such as the preliminary hearing transcript, until after his trial. He denied that he and counsel reviewed the discovery materials together or that counsel discussed them with him. He said it was counsel's decision, not his, that he not testify, but he acknowledged that he heeded the advice of counsel in this regard.

On redirect examination, the Petitioner testified that he wanted to testify about his alibi defense at his trial. He said Ms. Hampton could have corroborated his alibi. On recross-examination, the Petitioner testified that Ms. Hampton was present outside the courtroom during his trial. He thought he came home around 8:00 or 8:30 on the night of the

-13-

crime. He said he bathed, ate, and went to bed. He did not recall what time he went to bed. He said that they watched a movie and that they did not talk about anything.

Assistant District Attorney General Dean DeCandia testified that he participated in the Petitioner's trial. He said he spoke with witnesses before the trial and denied that he advised them how to testify. He specifically denied that he told the witnesses how to testify during the rebuttal proof. He said that he might leave the courtroom to get something from his office or to use the restroom but that he would not leave to talk to a witness who had not yet testified.

On cross-examination, General DeCandia testified that at some point, some of the witnesses made the prosecutors aware that Mr. Sulton's statements made after the crime were inconsistent with his trial testimony. He did not recall whether he advised defense counsel. He said Mr. Sulton gave conflicting statements to the police, first claiming he was not present for the shooting and only heard about it, but later saying he came to the scene after he heard shots and took a gun from the victim. He said that during cross-examination, Mr. Sulton first claimed he had not been at the scene but later said he was in his apartment when the shooting happened and took a gun from his television stand and went toward the Petitioner.

General DeCandia testified that the fifteen-year offer was made during the trial. He saw trial counsel lean over and speak to the Petitioner. He stated that almost immediately thereafter, counsel advised him that the Petitioner rejected the offer.

The trial court denied relief in a detailed order. The court discredited the testimony of the Petitioner and accredited that of trial counsel. The court found that the Petitioner was not denied the effective assistance of counsel. The court did not, however, address the allegation that the Petitioner was entitled to a new trial due to prosecutorial misconduct. This appeal followed.

**I**

The Petitioner contends that trial counsel provided ineffective assistance in the trial proceedings. The State contends that the trial court correctly determined that the Petitioner failed to prove this claim. We agree with the State.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn.

-14-

2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were "within the range of competence demanded of attorneys in criminal cases." Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir.1974), and United States v. DeCoster, 487 F.2d 1197, 1202–04 (D.C. Cir. 1973). Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are

informed ones based upon adequate preparation.  See DeCoster, 487 F.2d at 1201; Hellard, 629 S.W.2d at 9.

The Petitioner argues that trial counsel provided ineffective assistance by failing to investigate the case and prepare adequately for the trial.  The trial court accredited trial counsel's testimony over that of the Petitioner and his wife.  Counsel testified that the Petitioner never mentioned an alibi defense, that the Petitioner eventually admitted his involvement, that he and the Petitioner had a good working relationship, that they reviewed the evidence together, that he communicated the plea offers to the Petitioner, that he met with the prosecutors to discuss the case, and that he was prepared for the trial.  Although counsel acknowledged that he did not conduct an independent investigation, he said that the facts were not in dispute and that the Petitioner did not identify any witnesses he should investigate.  He stated that he urged the Petitioner to identify the person who told him the Petitioner's friend had been shot but that the Petitioner insisted he did not want to involve her.  The court found that counsel did not reveal any confidential or privileged information by suggesting that the Petitioner might not testify and that the experienced attorneys involved in the case were familiar with a defendant's Fifth Amendment privilege not to testify.  The court rejected the claim that counsel's performance was deficient.  The court likewise found that the defense strategy was sound, given the facts of the case.  The evidence does not preponderate against the trial court's findings.  Those findings support the trial court's determination that the Petitioner failed to establish that counsel's performance was deficient or that the Petitioner was prejudiced by the performance.  The Petitioner is not entitled to relief.

## II

The Petitioner contends that he should receive a new trial due to prosecutorial misconduct because one of the prosecutors improperly advised a witness of the substance of another witness's testimony and instructed the witness to testify consistently.  The State acknowledges that the trial court did not make credibility findings with respect to the conflicting evidence regarding this issue but contends that the Petitioner waived consideration of the issue by failing to raise it on direct appeal.

We agree with the State's contention that the issue is waived because it was not raised on direct appeal.  See T.C.A. § 40-30-106(g) (2006) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented" subject to certain exceptions.); e.g., Brimmer v. State, 29 S.W.3d 497, 530 (Tenn. Crim. App. 1998) (holding that prosecutorial misconduct claim was waived in post-conviction action because it was not raised on direct appeal).  We note that Ms. Royston did

not recall when she told trial counsel about the alleged prosecutorial misconduct. Because the record does not establish that counsel was unaware of the alleged misconduct at the time of the direct appeal, the issue is waived.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE